IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **Tracy Thompson** | : | |
| **5053 Killowen Court** | : | |
| **Columbus, Ohio  43230** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | Case No. 2:12-cv-1087 |
| v. | : | |
| | : | Judge |
| **The Ohio State University** | : | |
| **c/o Christopher M. Cully, Esq.** | : | |
| **General Counsel** | : | |
| **1590 North High Street** | : | |
| **Suite 500** | : | |
| **Columbus, Ohio  43201** | : | **JURY DEMAND** |
| | : | **ENDORSED HEREON** |
| **and** | : | |
| | : | |
| **Sharon Schweikhart, Ph.D.** | : | |
| **2495 Bryden Road** | : | |
| **Columbus, Ohio 43209** | : | |
| | : | |
| **and** | : | |
| | : | |
| **Ann Salimbene, Ph.D.** | : | |
| **110 Kingsdale Terrace** | : | |
| **Columbus, Ohio  43220** | : | |
| | : | |
| **and** | : | |
| | : | |
| **Gretchen Metzelaars, Ph.D.** | : | |
| **122 Winthrop Road** | : | |
| **Columbus, Ohio  43214** | : | |
| | : | |
| **Defendants.** | : | |

## COMPLAINT

Plaintiff, Tracy Thompson, brings this action against defendants – The Ohio State University, Dr. Sharon Schweikhart, Dr. Ann Salimbene, and Dr. Gretchen Metzelaars – for violations of Plaintiff's rights to equal protection of the laws under the Fourteenth Amendment to the United States Constitution, and for racial discrimination and retaliation in violation of

42 U.S.C. § 1983, and Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.), for unlawful First Amendment retaliation pursuant to 42 U.S.C. § 1983, and for violations of her substantive due process rights pursuant to 42 U.S.C. § 1983. Plaintiff's allegations, and the relief she seeks, are as follows:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff, Tracy Thompson, is a citizen of Ohio who resides in Franklin County, Ohio. She enrolled at Ohio State University in the Master's program in Public Health in the fall of 2009. Plaintiff brings this action against defendants – The Ohio State University, Dr. Sharon Schweikhart, Dr. Ann Salimbene, and Dr. Gretchen Metzelaars – for violations of Plaintiff's rights to equal protection of the laws under the Fourteenth Amendment to the United States Constitution, and for racial discrimination and retaliation in violation of 42 U.S.C. § 1983, and Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.), and violations of her substantive due process rights (pursuant to 42 U.S.C. § 1983).

2. Defendant, The Ohio State University, is a state university in Ohio that receives federal funding.

3. Defendant, Dr. Sharon Schweikhart, is a professor in the College of Public Health at Ohio State University. At all times relevant hereto, Dr. Schweikhart was a state actor. She is being sued in her individual capacity.

4. Defendant, Dr. Ann Salimbene, is a professor and the Assistant Dean in the College of Public Health at Ohio State University. At all times relevant hereto, Dr. Salimbene was a state actor. She is being sued in her individual capacity.

5. Defendant, Dr. Gretchen Metzelaars, is a Senior Associate Vice President in the Office of the Vice President for Student Life at Ohio State University. At all times relevant hereto, Dr. Metzelaars was a state actor. She is being sued in her individual capacity.

- 2 -

6. This Court has jurisdiction over the claims herein pursuant to 28 U.S.C. §§ 1331 and 1343. This action arises under the Fourteenth Amendment to the United States Constitution, and under federal laws 42 U.S.C. § 1983 and Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.).

7. Venue herein is proper pursuant to 28 U.S.C. §1391 and because the parties hereto are residents of this District and the events giving rise to this action occurred in this District.

## BACKGROUND FACTS

8. Plaintiff Tracy Thompson enrolled in the Master's in Health Administration program in the College of Public Health at The Ohio State University in fall, 2009.

9. Ms. Thompson is African-American.

10. The Master's program includes various mandatory and elective coursework, and is most commonly completed by students in the program in two years.

11. Upon enrolling in the Master's program, Ms. Thompson anticipated that she would graduate with her Master's degree in the spring of 2011. Ms. Thompson entered the program along with approximately thirty other students. Of those students, Ms. Thompson was the only African-American.

12. Ms. Thompson successfully completed her first year in the Master's program during the 2009-2010 academic year.

13. During the winter, 2010 quarter, Ms. Thompson took a course, Health Care Operations, with Dr. Sharon Schweikhart. Dr. Schweikhart is white.

14. Dr. Schweikhart has been a professor at Ohio State University since approximately 1990.

15. During her time in Dr. Schweikhart's course, Ms. Thompson began to feel that Dr. Schweikhart was singling her out for mistreatment. For instance, Ms. Thompson failed her mid-term in the Health Care Operations course. She approached Dr. Schweikhart to discuss how she could improve her performance in the course, and Dr. Schweikhart responded by telling Ms. Thompson that she should "figure it out."

16. A number of other students noted Dr. Schweikhart's dislike of Ms. Thompson. At various times, classmates told Thompson that it was obvious that Dr. Schweikhart did not like her, that Dr. Schweikhart "hates [Thompson's] guts," and that the way Schweikhart treated Thompson was inappropriate.

17. During fall quarter, 2010, Thompson submitted a paper in Schweikhart's Health Care Information Systems course. Dr. Schweikhart specifically instructed the class to use a particular, informal citation style. Thompson used that citation style for the paper in question, as did her classmates.

18. After receiving Thompson's paper, Schweikhart made allegations of plagiarism against Thompson.

19. Thompson's paper, however, was cited using the format required by Schweikhart.

20. Nevertheless, Schweikhart complained about Thompson to the University's Committee of Academic Misconduct, accusing Thompson of plagiarism.

21. Schweikhart did not make charges of plagiarism against any of the white students in the class who used the same citation style. Schweikhart's decision to charge Thompson with plagiarism was motivated by Thompson's race, was malicious, and was made with an intent to deprive Thompson of her federally protected rights. Schweikhart intentionally discriminated against Thompson due to Thompson's race.

22. In January, 2011, Thompson contacted OSU's Office of Student Advocacy and Office of Human Resources to discuss her complaints about race discrimination at the hands of Dr. Schweikhart. Thompson made various other complaints of race discrimination to different departments within the University. All of these complaints addressed race discrimination at a public state university – a matter of public concern – and were protected by the First Amendment.

23. Despite these complaints, the University failed entirely to investigate the complaints of race discrimination in any meaningful way.

24. Moreover, the minimal investigation that was done revealed compelling evidence of race discrimination, as described below, yet the University failed to take any steps to protect Ms. Thompson, or any steps to remedy Dr. Schweikhart's pattern of race-based discrimination.

25. Upon information and belief, since her tenure began with OSU in 1990, Dr. Schweikhart has taught more than ten times as many white students as African-American students, based on the demographics of enrollment in the Public Health Master's Program at OSU.

26. In the approximately two decades that Dr. Schweikhart taught at OSU from the start of her tenure through the date on which she accused Thompson of plagiarism, Dr. Schweikhart has referred three students (including Thompson) to the academic misconduct process.

27. During those two-plus decades, Dr. Schweikhart taught hundreds of white students in the public-health masters program. She accused no white students of academic misconduct.

28.     During that same time span, Dr. Schweikhart taught only a few dozen African-American students in the program.  All three of the students she accused of academic misconduct have been African-American.

29.     The rate at which Dr. Schweikhart accuses African-American students in the Public Health program of academic misconduct (3 out of perhaps 30 or so African-American students, or 10% *of 30*), relative to the rate at which she accuses white students in the Public Health program of academic misconduct (0 out of perhaps 600 or so, or 0% *of 600*), is extraordinarily unlikely to occur by mere chance or coincidence.

30.     Ohio State University was and is aware of these statistics regarding Dr. Schweikhart's history of race discrimination against African-American students.  Rather, however, than admitting what this record reflects, that Dr. Schweikhart has exhibited racially discriminatory animus, Ohio State tried to cover up Dr. Schweikhart's discrimination.  For instance, Ohio State issued a human resources report that addressed Dr. Schweikhart's history of only accusing African-American students of misconduct, and laughably stated that Dr. Schweikhart's egregious record of discrimination somehow did not constitute "positive evidence of racial discrimination."

31.     Ohio State University was, and remains, aware of this compelling evidence of discrimination, as well as Plaintiff's complaints, and therefore has notice of Dr. Schweikhart's discrimination against African-American students.  Ohio State University, however, has done nothing to discipline Dr. Schweikhart, has done nothing to stop Dr. Schweikhart from continuing her pattern of discrimination against African-American students, and has done nothing to protect Plaintiff from additional harm at the hands of Dr. Schweikhart and the University.  This and other conduct or lack of action on the part of the University constitutes intentional discrimination.  The University knew of Schweikhart's discriminatory treatment of Ms.

Thompson and intentionally failed to take action, thereby intentionally subjecting Ms. Thompson to discriminatory treatment based on her race.

32. Moreover, the referral to the academic misconduct committee, the referral to the University Conduct Board (described below), and the sanctions Ms. Thompson received (also described below) all constitute University action. As a result, because those actions were all taken or resulted from intentional discrimination, the University itself has intentionally discriminated against Thompson.

33. At her hearing on Schweikhart's plagiarism charge before the Committee of Academic Misconduct, Thompson was not permitted to discuss or provide evidence of the fact that other students in the class used the same citation style as she had used.

34. The Committee of Academic Misconduct, having refused to consider the evidence that Ms. Thompson was innocent and that the charges against her were racially motivated, found against Ms. Thompson, determining that she was guilty of plagiarism and failing to comply with course policy.

35. At the end of the hearing, the coordinator of the Committee of Academic Misconduct told Ms. Thompson that (s)he "highly encouraged" Ms. Thompson "to appeal."

36. The Committee sanctioned Thompson by giving her a failing grade in the Health Care Information Systems course, and suspending her for the spring and summer quarters. The suspension prevented Ms. Thompson from being on OSU's campus during the term of her suspension.

37. Ms. Thompson did appeal. Her appeal was denied, and the sanctions remained in place.

38. The conditions of Ms. Thompson's suspension stated:

A student who has been dismissed or suspended from the university shall be
denied all privileges afforded a student and shall be required to vacate campus at a

time determined by the hearing officer or panel.  In addition, after vacating campus property, a suspended or dismissed student may not enter upon campus and/or other university property at any time, for any purpose, in the absence of express written permission **from the vice president for student affairs** or his/her designee.  **To seek such permission, a suspended or dismissed student must file a written petition to the *vice president for student affairs* for entrance to the campus for a limited, specified purpose or to have the terms of his condition modified or reduced.** (Emphasis added.)

39. During the course of this suspension, Ms. Thompson reached out to various faculty members in her program in an attempt to receive guidance for how she should proceed towards her degree once her suspension was lifted, including guidance on how to enroll in classes for the quarter following her suspension.  She was ignored.

40. As a result, she communicated to Dr. Javaune Adams-Gaston, Vice-President for Student Life, and Dr. Stanley Lemeshow, Dean of the College of Public Health, asking for a meeting to discuss continuing to pursue her degree (as she was suspended, not dismissed), and asking for the University's assistance in working with her towards the completion of her program.  The letter indicated that she had concerns about racially discriminatory treatment, and wished to complete her degree without being subject to further discriminatory treatment.  She was ignored.  The University's decision to ignore Thompson's reasonable requests reflects the University's intent to discriminate against Thompson on the basis of her race.

41. Ms. Thompson was suspended during winter quarter.  While she was given an F in her Health Care Information Systems course, she was permitted to complete the other classes in which she was enrolled, as her suspension did not take effect until spring quarter.

42. This suspension had significant ramifications, as Ms. Thompson needed only one additional course to complete her degree requirements.  This course, however, is only offered in the spring.  As a result, the suspension would delay her graduation by a full year.

43. At the time of her suspension, Ms. Thompson was enrolled in a Six-Sigma course though the College of Business.  This course was a six-credit class that spanned the entire winter

quarter and also the first half of the spring quarter.  The class required an intensive, time-consuming group project that is fundamental to six-sigma certification.

44.	Thus, Ms. Thompson's sanction permitted her to complete all of the courses in which she had been enrolled at the time, except for the six-sigma class, due to the fact that that course ran into the spring quarter.

45.	Ms. Thompson therefore scheduled a meeting with Dr. Javaune Adams-Gaston, Vice-President for Student Life (also known as the vice-president for student affairs), to discuss the implications of her suspension and inquire with Dr. Adams-Gaston as to whether she could be permitted to complete the six-sigma course.

46.	Dr. Adams-Gaston told Ms. Thompson that completing the six-sigma course was acceptable with her if it was also acceptable with her six-sigma professor.

47.	Ms. Thompson therefore made an appointment with her six-sigma professor, Doug Evans, who agreed that it was acceptable to him for Thompson to complete the course, and that, to best enable compliance with the suspension, Thompson's group could regularly meet off campus.

48.	There were a few occasions in which, for purposes of completing this academic work, it was necessary for Ms. Thompson to come on campus.  On each of these occasions, Ms. Thompson corresponded with Dr. Adams-Gaston to get permission to be on campus, and that correspondence made clear that the purpose of being on campus was to do academic work.  On each such occasion, Dr. Adams-Gaston granted permission for Ms. Thompson to be on campus.

49.	In this manner, Ms. Thompson was able to complete the six-sigma course.

50.	Dr. Adams-Gaston never indicated in any way that she did not have the authority to grant this request.

51. Indeed, as the vice-president of student affairs, Dr. Adams-Gaston is the individual from whom, by the very terms of the suspension, Ms. Thompson was supposed to seek such permission.

52. The suspension states that, "a suspended or dismissed student may not enter upon campus and/or other university property at any time, for any purpose, in the absence of express written permission from the vice president for student affairs."

53. Not long after her suspension was lifted, Ms. Thompson was stunned to learn that she was being charged with two new supposed violations of the University Student Conduct Policy – dishonest conduct (3335-23-4(F)) and failure to comply with sanctions (3335-23-04(N8)).

54. Defendant Salimbene was primarily responsible for the filing of these charges against Thompson.

55. Dr. Salimbene was motivated to pursue these charges against Thompson due to Thompson's race, and in retaliation for Thompson's allegations of race discrimination against Salimbene's colleague and friend, Dr. Schweikhart. Salimbene's decision to charge Thompson with misconduct was motivated by Thompson's race and Thompson's complaints about race discrimination, was malicious, and was made with an intent to deprive Thompson of her federally protected rights. Dr. Salimbene knew that there was no rational or reasonable basis for the charges she pursued against Thompson.

56. Dr. Salimbene brought these charges against Thompson knowing that they were unfounded, seeking only to punish Thompson out of animosity against Thompson due to her race and with a retaliatory motive due to Thompson's complaints about race discrimination, which angered and upset Salimbene and caused her to retaliate against Thompson.

57. The essence of these charges was that Thompson should not have gone to Dr. Adams-Gaston for permission to complete the Six-Sigma course, that Thompson should have known that Dr. Adams-Gaston did not have the authority to permit her to complete the Six-Sigma course, and that the permission granted by Dr. Adams-Gaston was not sufficient to permit Thompson to complete the Six-Sigma course.

58. This second set of charges against Thompson was, of course, absurd, as Thompson was essentially charged with misconduct for following the very procedures that the terms of her suspension required her to follow.

59. On this second set of charges against her, Thompson was given the option of a hearing before the University Conduct Board, which she elected to pursue.

60. The Conduct Board that heard the charges against Thompson consisted of two graduate students, one undergraduate student, an OSU employee who worked in the recreational sports department, and an OSU employee who worked in the dining services department.

61. At the hearing, Dr. Salimbene served in the role of prosecutor, attending the entire hearing, arguing in favor of discipline for Thompson, cross-examining Thompson, impacting the conduct of the hearing, and putting her weight and imprimatur as Assistant Dean of the Graduate School behind the charges and quest for further discipline.

62. The Board issued a ruling finding Thompson not in violation on the charge of dishonest conduct (3335-23-04(F)), but, baselessly bending to the will of Dr. Salimbene, found Thompson in violation as to the charge of failure to comply with a sanction (3335-23-04(N8)). The Board's ruling contained no explanation of the basis for the decision.

63. Thompson was properly found "not in violation" on the dishonesty charge. She was, however, improperly found to be in violation on the failure to comply with a sanction charge. Even if she was guilty of this infraction (and, to be clear, she was not), the sanction

imposed on Thompson was grossly disproportionate to the misconduct alleged. Despite finding that she had not engaged in dishonest conduct, the Board shockingly imposed an extraordinarily harsh penalty: a suspension from the University from March 9, 2012 through August 12, 2012. In addition, she was required to submit an academic paper on an ethical dilemma in the field of Public Health.

64. Ms. Thompson was advised of her right to appeal the Board's decision, and she did appeal. The appeal was ruled upon by Dr. Gretchen Metzelaars, Senior Associate Vice President in the Office of the Vice President for Student Life. Dr. Metzelaars reports to Dr. Adams-Gaston.

65. Ordinarily, the appeal would have been heard by Dr. Adams-Gaston, however, because of Dr. Adams-Gaston's role in the issues related to Thompson's case, Dr. Metzelaars instead heard the appeal. Dr. Metzelaars had the authority to uphold, modify, or reverse the panel's recommendation. Dr. Metzelaars made the ultimate decision with regard to both the finding regarding Thompson's innocence or guilt and the discipline imposed.

66. Dr. Metzelaars denied Thompson's appeal. The decision from Metzelaars states: "After giving your request careful consideration, I must deny your appeal. I am convinced that all circumstances were considered during your judicial process and that the disciplinary process was appropriate. I will, therefore, support the sanctions that resulted from your case. It is my sincere hope that you use your time away from OSU well and that you challenge yourself to pursue your academic and professional interests."

67. Despite applying a lengthy suspension that she knew would cause Thompson's graduation to be delayed by a year, Dr. Metzelaars insultingly did not even bother to provide any analysis as to how a multiple-quarter suspension was appropriate for an infraction that involved

no dishonesty and no intentional misconduct of any kind, even under the committee's improper ruling.

68.     Thompson did everything that the terms of her suspension required her to do, received permission to participate as she did in the remainder of her Six-Sigma course from the only person who had the authority to grant her such permission, and then was harshly and arbitrarily disciplined for violating the terms of her suspension, when she did nothing of the sort. The offense that Ms. Thompson was (wrongly) found to have committed was so benign, and the punishment she received so extraordinary, that there is no rational relationship between the two.

69.     Ms. Thompson's suspension on this charge caused her graduation to be delayed by an additional year.

## COUNT ONE – FIRST AMENDMENT RETALIATION

70.     The foregoing allegations are realleged as if fully restated herein.

71.     Plaintiff brings a claim for unlawful retaliation in violation of the First Amendment pursuant to 42 U.S.C. § 1983 against Dr. Salimbene.

72.     Plaintiff's various complaints about race discrimination at the University constituted protected expressions under the First Amendment.

73.     Plaintiff's complaints were not made pursuant to any official duties imposed upon her, and the complaints addressed an issue of public concern.

74.     Dr. Salimbene brought charges against Thompson that she knew to be unfounded, pursued those charges, and sought drastic and inappropriate discipline against Thompson, in retaliation for Thompson lodging protected complaints about race discrimination against her colleague and friend, Dr. Schweikhart.

75.     As a direct and proximate result of the conduct of Defendant Salimbene, Plaintiff has suffered and continues to suffer emotional pain, suffering, stress, inconvenience,

embarrassment, humiliation, mental anguish, loss of enjoyment of life, other nonpecuniary losses, and other injury, including lost wages.

### COUNT TWO – SUBSTANTIVE DUE PROCESS

76. The foregoing allegations are realleged as if fully restated herein.

77. Plaintiff, in response to her first suspension, followed the precise steps that the University prescribed for her in seeking permission from the Vice-President of Student Affairs to enter campus to complete her Six-Sigma course.

78. While the panel that heard the allegations against Plaintiff properly found that Plaintiff did not engage in any dishonest conduct, the panel, due to Salimbene's conduct and at Salimbene's behest, found that Plaintiff, despite the authorization she received from the very person from whom she was supposed to receive it, somehow violated the terms of her suspension.

79. Even if Plaintiff's conduct constituted an innocent but technical violation of her suspension (and it did not), a multi-quarter suspension resulting in an additional one-year delay of Plaintiff's graduation constituted an absurd, arbitrary, outrageous, and capricious punishment that shocks the conscience and is so grossly disproportionate to any wrongdoing by Plaintiff to amount to a violation of her right to substantive due process.

80. The Defendants responsible for this substantive due process violation are Dr. Salimbene, who pursued the improper charges, participated in the conduct of the hearing, and advocated for the improper discipline, and Dr. Metzelaars, who reviewed, affirmed, and imposed the baseless, indefensible, and absurd sanction against Thompson.

81. As a direct and proximate result of the conduct of these Defendants Salimbene and Metzelaars, Plaintiff has suffered and continues to suffer emotional pain, suffering, stress,

inconvenience, embarrassment, humiliation, mental anguish, loss of enjoyment of life, other nonpecuniary losses, and other injury, including lost wages.

### COUNT THREE – RACE DISCRMINATION AND RETLATION

82. The foregoing allegations are realleged as if fully restated herein.

83. Plaintiff was treated differently than her white classmates by Defendants Schweikhart and Salimbene.

84. Defendants' mistreatment of Plaintiff was motivated by her race.

85. Defendants' misconduct deprived Plaintiff of her right to equal protection under the Fourteenth Amendment.

86. Defendants acted under color of law in denying Thompson equal protection of the laws, and discriminating against Thompson on the basis of race, in violation of 42 U.S.C.§ 1983.

87. Defendant Salimbene acted under color of law in retaliating against Thompson for making complaints about race discrimination against Schweikhart.

88. As a direct and proximate result of the conduct of Defendants Schweikhart and Salimbene, Plaintiff has suffered and continues to suffer emotional pain, suffering, stress, inconvenience, embarrassment, humiliation, mental anguish, loss of enjoyment of life, other nonpecuniary losses, and other injury, including lost wages.

### COUNT FOUR – DISCRIMINATION AND RETALIATION IN VIOLATION OF TITLE VI

89. The foregoing allegations are realleged as if fully restated herein.

90. Ohio State University, as a recipient of federal funds, discriminated against Plaintiff based on her race in violation of 42 U.S.C. § 2000d *et seq.*

91. Much of the conduct at issue that violated Title VI, including both sets of charges against Thompson and the sanctions imposed, are directly attributable to Ohio State University because the University itself took official action against Thompson.

92. Defendant Ohio State University actively participated in the intentionally discriminatory conduct against Thompson through the University's Committee of Academic Misconduct and University Conduct Board and the University's decisions to suspend Plaintiff.

93. Defendant Ohio State University is liable for all of the unlawful conduct described above because the University: impliedly authorized, approved, or knowingly acquiesced in the misconduct by failing to appropriately investigate Thompson's complaints of race discrimination and by failing to punish Schweikhart and Salimbene for discriminating against Thompson based on her race; and demonstrated deliberate indifference to Thompson's constitutional rights by failing to properly investigate her complaints of race discrimination, ignoring the compelling evidence of race discrimination at the hands of Dr. Schweikhart, and covering up the knowledge it had that Dr. Schweikhart acted with racially discriminatory animus.

94. As a direct and proximate result of the conduct of the Defendant Ohio State University, Plaintiff has suffered and continues to suffer emotional pain, suffering, stress, inconvenience, embarrassment, humiliation, mental anguish, loss of enjoyment of life, other nonpecuniary losses, and other injury, including lost wages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests that this Court enter judgment in her favor, and against defendants, as follows:

(a) Award plaintiff compensatory damages in an amount to be determined at trial;

(b) Award plaintiff punitive damages in an amount to be determined at trial;

(c) Award plaintiff reasonable attorney fees and the costs of this action;

      (d)     Award plaintiff all damages and remedies available under § 1983, 42 U.S.C. § 2000d *et seq.*, and the United States Constitution; and

      (e)     Award plaintiff such other and further relief as this Court may deem appropriate.

Respectfully submitted,

/s/ John C. Camillus
John C. Camillus, Trial Attorney    (0077435)
Law Offices of John C. Camillus, LLC
P.O. Box 141410
Columbus, Ohio  43214
(614) 558-7254
(614) 559-6731 (Facsimile)
jcamillus@camilluslaw.com

/s/ Rex H. Elliott
Rex H. Elliott                 (0054054)
Charles H. Cooper, Jr.     (0037295)
Cooper & Elliott, LLC
2175 Riverside Drive
Columbus, Ohio  43221
(614) 481-6000
(614) 481-6000 (Facsimile)

Attorneys for Plaintiff
Tracy Thompson

**JURY DEMAND**

Plaintiff requests trial by a jury of her peers.

/s/ John C. Camillus
John C. Camillus