**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**TRACY THOMPSON,**

      **Plaintiff,**                       **Case No. 2:12-cv-1087**
                                              **JUDGE GREGORY L. FROST**
**v.**                                          **Magistrate Judge Deavers**

**THE OHIO STATE UNIVERSITY, et al.,**

      **Defendants.**

<u>**OPINION AND ORDER**</u>

This matter is before the Court for consideration of Defendants' motion for summary judgment (ECF No. 69), Plaintiff's memorandum in opposition (ECF No. 92), and Defendant's reply memorandum (ECF No. 93).  For the reasons that follow, the Court **GRANTS** the motion.

### I.      BACKGROUND

Plaintiff Tracy Thompson is an African-American female.  In her complaint, Plaintiff alleges that she suffered a series of injustices during the time she was pursuing a Master's degree in Health Administration (the "Program") at the Ohio State University ("OSU").

Defendant Sharon Schweikhart, Ph.D., is a professor in OSU's College of Public Health.  Dr. Schweikhart, who is a Caucasian female, has been a professor with OSU since 1990.

Plaintiff communicated with Dr. Schweikhart prior to enrolling in the Program.  According to Dr. Schweikhart, she helped Plaintiff get into the Program by helping her strengthen her candidacy and later advocating to the Dean of the Graduate School on Plaintiff's behalf.  According to Plaintiff, Dr. Schweikhart did not help her get into the Program, but instead misled Plaintiff about the prerequisites for admission to the Program.  Plaintiff testified that she believes Dr. Schweikhart misled her about the academic requirements for admission to the Program because of Plaintiff's race.

Plaintiff was accepted into the Program. She, along with approximately thirty other students, enrolled in the Program in the fall of 2009. Plaintiff was the only African-American student in her class, although it appears from the record that there were other minority students in the class. The Program typically takes two years to complete; accordingly, Plaintiff planned to graduate from the Program in the spring of 2011.

During the fall 2009 quarter, Plaintiff took Dr. Schweikhart's Operations Management for Health Services Organizations class. Plaintiff received a failing grade on the midterm. When she went to talk to Dr. Schweikhart about how to improve her grade, Dr. Schweikhart told her to "figure it out." Plaintiff asserts that this comment reflects Dr. Schweikhart's animosity towards her.[1]

Plaintiff received a B as her final grade. That grade was the lowest grade handed out in Dr. Schweikhart's class that quarter. Four other students also received a B as their final grade, while thirty-two students received grades higher than a B.

Notwithstanding Plaintiff's grade, on October 6, 2010, Dr. Schweikhart wrote several letters of recommendation to potential employers on Plaintiff's behalf. In those letters, Dr. Schweikhart indicated that the faculty had selected Plaintiff to represent the Program in a national competition. Dr. Schweikhart also made several positive comments about Plaintiff's experience and capabilities.

During this time (the fall quarter of 2010), Plaintiff was enrolled in a second class taught by Dr. Schweikhart. This class, called Health Care Information Systems, required students to

---

[1] Plaintiff also asserts that other students picked up on Dr. Schweikhart's negative attitude towards Plaintiff; however, Plaintiff did not provide any non-hearsay evidence in support of that assertion. Hearsay statements, such as the fact that other students told Plaintiff Dr. Schweikhart did not like her, are not properly before the Court on this motion for summary judgment. *See Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (citing *Daily Press, Inc. v. United Press Int'l*, 412 F.2d 126, 133 (6th Cir. 1969)); Fed. R. Ev. 801(c)(2).

submit an individual paper assignment.  Plaintiff submitted her assignment on November 24, 2010.

According to Dr. Schweikhart, Plaintiff's submission stood out as unusual compared to the other students' submissions.  Dr. Schweikhart typed some of the seemingly anomalous phrases into Google and made the following discoveries: (1) portions of Plaintiff's paper matched sources that she had not cited, (2) portions of Plaintiff's paper contained direct quotes from other sources, but did not contain quotation marks around those quotes, (3) some of the articles Plaintiff did cite were different from the actual source, (4) portions of Plaintiff's paper contained direct (or nearly direct) quotes from sources cited in the reference section, and (5) several sections of Plaintiff's paper cited sources with no discernible connection to the content of that section.

Plaintiff characterizes the incident as one in which she used an informal citation style.  Plaintiff argues that she "pulled language directly from sources, but did not use quotes around the language, but rather, simply cited to the source in footnotes," which was a "common practice" in Dr. Schweikhart's courses.  (ECF No. 92, at 4.)  Plaintiff does not, however, directly dispute Dr. Schweikhart's version of the facts on this issue (such as the facts that Plaintiff failed to cite some sources at all and cited other sources only in the reference section of her paper).  Plaintiff similarly does not present any evidence other than her own testimony that such actions were "common practice" in Dr. Schweikhart's class.[2]  Finally, Plaintiff does not dispute that her actions constituted plagiarism within the meaning of OSU's Code of Student Conduct.

---

[2] Plaintiff also asserts that other (non-African-American) students admitted to her that they had similarly plagiarized their papers.  Again, however, Plaintiff fails to offer any non-hearsay evidence to that effect.  *See* ECF No. 70, at PAGEID # 549–50.  The Court therefore will not consider that assertion in adjudicating this motion for summary judgment.  *See Wiley*, 20 F.3d at 226.

Dr. Schweikhart reported the suspected plagiarism to the Committee on Academic Misconduct ("COAM"). Dr. Schweikhart's email to the COAM stated:

> I am sending [this] to COAM because the situation surrounding this paper and this student['s] situation is somewhat troubling. The student has performed quite well and appropriately in previous courses . . . . Further, the student has had a difficult and stressful quarter, with her mother being very ill and a job search in progress. I do not believe the student should be suspended, as it would delay graduation by a full year if the student cannot take courses in winter or spring quarter.

(ECF No. 71-1, at PAGEID # 963.)

The COAM, which is a neutral panel composed of faculty members and students, investigated Dr. Schweikhart's referral. On January 5, 2011, the COAM formally charged Plaintiff with plagiarism and with failure to comply with course/program policies and/or guidelines. The COAM scheduled a hearing on Plaintiff's case.

At some point before the hearing, Plaintiff met with OSU's human resources department to discuss her issues regarding Dr. Schweikhart. Plaintiff informed the human resources representative that she wanted to meet with Dr. Schweikhart to resolve the issues in order to ensure that she could graduate in the spring.

On January 27, 2010, a COAM panel of five neutral faculty and students heard Plaintiff's case. Dr. Schweikhart was not a part of the hearing panel. Defendant Ann Salimbene, the Associate Dean of the Graduate School, was present at the hearing but did not participate.

Plaintiff had an opportunity at the hearing to present a written position statement and answer questions. Plaintiff did not mention her concerns about race discrimination during the hearing or in her written statement to the panel. In fact, in her written statement to the panel, Plaintiff stated: "I am pleased that Dr. Schweikhart did bring forth the fact that I am a good student" and "I also appreciate Dr. Schweikhart's statement that I should not be suspended."

(ECF No. 70-3, at PAGEID # 835–36.)  Plaintiff was not permitted to offer evidence during the hearing that other students also had committed plagiarism in Dr. Schweikhart's class.

The COAM panel found Plaintiff guilty of both charges.  The panel informed Plaintiff of that fact on January 27, 2011.  Notwithstanding Dr. Schweikhart's comments, the panel sanctioned Plaintiff by giving her a failing grade for the course and a two-quarter suspension. The suspension, which was handed down during the winter quarter, would cover the spring and summer quarters.

Plaintiff appealed the COAM panel's decision to the OSU Provost on the ground that the suspension imposed was "grossly disproportionate to the violation committed."  (ECF No. 70-3, at PAGEID # 840.)  In her appeal, Plaintiff did not mention any concerns that Dr. Schweikhart had reported the suspected plagiarism because of Plaintiff's race.

The Provost declined to overrule the panel's sanction.  In a letter dated February 11, 2011, the Provost informed Plaintiff that her suspension was final.  The conditions of Plaintiff's suspension stated:

> A student who has been dismissed or suspended from the university shall be denied all privileges afforded a student and shall be required to vacate campus at a time determined by the hearing officer or panel. In addition, after vacating campus property, a suspended or dismissed student may not enter upon campus and/or other university property at any time, for any purpose, in the absence of express written permission from the vice president for student affairs or his/her designee. To seek such permission, a suspended or dismissed student must file a written petition to the vice president for student affairs for entrance to the campus for a limited, specified purpose or to have the terms of [t]his condition modified or reduced.

(ECF No. 70-3, at PAGEID # 838.)

On March 4, 2011, Plaintiff lodged a formal complaint against Dr. Schweikhart with OSU's human resources department.  Plaintiff alleged that Dr. Schweikhart discriminated against her on the basis of race by referring her to the COAM.  OSU conducted an investigation into

Plaintiff's allegations but did not find evidence of race discrimination.  That investigation will be discussed in more detail below.

Because the COAM panel handed down its suspension during the winter quarter, Plaintiff was permitted to finish the courses in which she was enrolled before her suspension took effect. One of those courses, a "Six-Sigma" course in which Plaintiff was enrolled through OSU's College of Business, spanned from winter quarter through the first half of the spring quarter. Plaintiff asserts that she was unsure whether she was allowed to complete the Six-Sigma course, given that she was permitted to complete the other classes in which she was enrolled during the winter quarter.  Defendants' position is that the Six-Sigma class was taught in two portions, with a four-credit portion taking place during the winter quarter and a two-credit portion taking place in the spring quarter, and that Plaintiff should have known that her suspension prevented her from taking the two-credit portion of the Six-Sigma course that spring.

The parties' versions of what happened next are very different.  According to Plaintiff, she met with OSU's Vice President for Student Affairs (Dr. Javaune Adams-Gaston) to discuss modifying her sentence to allow her to complete the Six-Sigma course.  Plaintiff testified that Dr. Adams-Gaston gave Plaintiff permission to complete the Six-Sigma course as long as she had her professor's permission (which Plaintiff obtained).  Plaintiff also testified that she obtained Dr. Adams-Gaston's permission to enter OSU's campus every time she had to do so in connection with the Six-Sigma course.

Defendants assert that Plaintiff met with Dr. Adams-Gaston to get general information on her suspension, and that Dr. Adams-Gaston has no authority to alter academic sanctions.  Dr. Adams-Gaston testified that she did not have the authority to allow Plaintiff to take courses in violation of her suspension.   Defendants maintain that Plaintiff misled her Six-Sigma professor into thinking she could complete his class when, in fact, her suspension forbid her from doing so.

Defendants assert that, because the system would not allow her to receive a grade for the spring portion of the Six-Sigma class, Plaintiff then signed up for the same two-credit Six-Sigma course the following fall.  Plaintiff informed her professor in the fall class that she already had completed the work for the class and should be given a grade based on that work.  The professor for the fall Six-Sigma course found Plaintiff's request to be bizarre.  That professor informed the graduate school of Plaintiff's request, and the matter came before Dr. Salimbene.

Dr. Salimbene discussed the situation with other faculty members and administrators and determined that Plaintiff had violated the terms of her suspension.  After discussing the matter with COAM, Dr. Salimbene referred the matter to the Office of Student Conduct ("OSC").

The OSC investigated the situation.  Andrea Goldblum, the OSU employee who conducted the investigation, determined that there was enough evidence to bring charges against Plaintiff.  The OSC therefore brought charges against Plaintiff for dishonest conduct and failure to comply with sanctions in violation of the Student Code of Conduct.

An OSC panel held a hearing on the new charges against Plaintiff.  Dr. Salimbene attended the hearing, gave an opening statement and a closing argument in favor of discipline, and asked questions of the witnesses.  One of the members of the hearing panel testified that it was unusual to have someone advocating for sanctions as Dr. Salimbene did.

The panel ultimately found in Plaintiff's favor on the first charge (dishonest conduct) but against her on the second charge (failure to comply with sanctions).  The panel imposed an additional two-quarter suspension as a sanction.  Plaintiff again unsuccessfully appealed the sanction on the grounds that it was disproportionate to the violation.

Immediately after the Board reached its decision, the head of the OSC emailed Dr. Salimbene at 3:49 a.m. to inform her of the results.  One of Plaintiff's theories this case is that Dr. Salimbene and Dr. Schweikhart are friends and that Dr. Salimbene referred Plaintiff to the

7

OSC in retaliation for complaining about Dr. Schweikhart.  Defendants, however, dispute that Drs. Salimbene and Schweikhart are friends.

Plaintiff served her two-quarter suspension without incident.  When her suspension expired, she reenrolled in Dr. Schweikhart's Health Care Information Systems class.  Plaintiff received an A from Dr. Schweikhart as her final grade.  Plaintiff later enrolled in another course taught by Dr. Schweikhart, Strategic Management and Program Development, in which she also received an A as her final grade.  Plaintiff graduated and received her Master's degree in Health Administration in the spring/summer of 2013.

Meanwhile, on November 12, 2012, Plaintiff filed the complaint that is the subject of this lawsuit.  Plaintiff's Amended Complaint names as defendants OSU, Dr. Schweikhart and Dr. Salimbene.[3]  The claims that remain pending in this litigation are: (1) a First Amendment retaliation claim against Dr. Salimbene for referring Plaintiff to the OSC, (2) an Equal Protection Claim under 42 U.S.C. § 1983 against Dr. Schweikhart for referring Plaintiff to the COAM, and (3) a Title VI claim against OSU.

The claim against OSU is based on the investigation it conducted regarding Plaintiff's allegations against Dr. Schweikhart.  OSU's investigation took place between March 4, 2011 and June 27, 2011.  During the investigation, it came to light that, in her twenty-plus years of teaching, Dr. Schweikhart previously had referred two African-American students (in addition to Plaintiff) to the COAM.  Dr. Schweikhart had not referred any white students to the COAM.

OSU concluded that those statistics did not mandate a finding of race discrimination. The investigator assigned to the case, Bryan Lenzo, issued a report concluding that there was "insufficient evidence to substantiate a violation of the Affirmative Action, Equal Employment

---

[3] Plaintiff's Amended Complaint also names Dr. Gretchen Metzelaars as a defendant; however, the Court previously dismissed all claims against her.

Opportunity & Non-Discrimination/Harassment Policy." (ECF No. 78-1, at PAGEID# 1436.) Mr. Lenzo acknowledged the statistics but concluded that they, by themselves, did not constitute "positive evidence of racial discrimination." (*Id.*)

Plaintiff argues that the report is flawed. The specific flaws can be summarized as follows:

- The report states that Plaintiff had taken two previous classes with Dr. Schweikhart, in which she received an A and a B+. The report contains the following conclusion: "[Plaintiff] received above average grades in both of her previous classes with Dr. Schweikhart . . . . Positive grades and recommendations are not consistent with actions of discriminatory animus." (*Id.*) That is inaccurate—Plaintiff had only taken one previous class with Dr. Schweikhart, and the grade she received (B) was not above-average.

- The report states that "Witness 3, who self-identified themselves as a minority, stated they have witnessed Dr. Schweikhart come down harder on [Plaintiff], but they didn't know if it was motivated by her race. Witness 3 stated they do not believe Dr. Schweikhart treats minority students poorly, but she was harder on [Plaintiff]." (*Id.* at PAGEID # 1435–36.) The report concludes: "[w]itness testimony from those who [Plaintiff] submitted would support her allegations—among them two minority students—unanimously stated they did not believe Dr. Schweikhart treated minorities poorly or differently." (*Id.*) Plaintiff asserts that the conclusion mischaracterizes Witness 3's testimony.

- The report stated that Dr. Schweikhart had referred three African-American students to the academic misconduct process over a thirty-year period. Dr. Schweikhart had only been teaching at OSU for twenty years.

- Mr. Lenzo had no basis to conclude that the statistics were not positive evidence of discrimination. Mr. Lenzo has no background in statistics and did not consult with anyone regarding the impact of the statistics in this case.

- Mr. Lenzo did not investigate whether white students had also committed plagiarism in Dr. Schweikhart's class.

After Mr. Lenzo issued his report, his supervisor (Olga Esquivel-Gonzalez) summarized the human resources department's findings an in email to another OSU employee. Ms. Esquivel-Gonzalez's email inaccurately stated that Plaintiff had received "very good grades" in "2 prior courses with Professor Schweikhart." (ECF No. 79-1, at PAGEID # 1528.) Ms. Esquivel-

Gonzalez's email did not note the fact that Dr. Schweikhart previously had referred two African-American students and no white students for academic misconduct.

From these facts, Plaintiff argues that OSU was deliberately indifferent to Plaintiff's right to be free from discriminatory treatment. Plaintiff also argues that Drs. Schweikhart and Salimbene are liable for violating her (Plaintiff's) constitutional rights.

Defendants moved for summary judgment on each of Plaintiff's claims. That motion is now ripe for the Court's consideration.

## II.    ANALYSIS

### A.  Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court therefore may grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc*., 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234–35 (quoting *Anderson*, 477 U.S. at 251–52).

### B.  § 1983 Claim Against Dr. Schweikhart

The Court first addresses Plaintiff's § 1983 claim against Dr. Schweikhart.  As the basis for that claim, Plaintiff asserts that Dr. Schweikhart deprived Plaintiff of her right to equal protection under the Fourteenth Amendment by reporting her suspected plagiarism to the COAM.  Plaintiff's Amended Complaint makes several additional allegations against Dr. Schweikhart; however, Plaintiff clarifies in her brief that Dr. Schweikhart's referral to the COAM is the sole basis of her Equal Protection claim.  *See* ECF No. 92, at 23 n. 7.

The Court set forth the standard for § 1983 Equal Protection claims in its January 6, 2014 Opinion and Order.  That is, Plaintiff must show that Dr. Schweikhart intentionally discriminated against her because of her race.  *See Midkiff v. Adams Cnty. Reg. Water Dist.*, 409 F.3d 758, 770 (6th Cir. 2005); *Purisch v. Tenn. Tech. Univ.*, 76 F.3d 1414, 1424 (6th Cir. 1996).

To prove discrimination, Plaintiff must prove that Dr. Schweikhart treated Plaintiff differently than she treats similarly-situated non-African-American students.  *See Bell v. Ohio State Univ.*, No. 2:98-CV-1274, 2992 WL 193694, at *13 (S.D. Ohio Feb. 5, 2002), *aff'd*, 351 F.3d 240 (6th Cir. 2003).  Plaintiff therefore must prove that Dr. Schweikhart treated Plaintiff differently than she treated non-African-American students who engaged in similar conduct as Plaintiff.  Because this standard also includes an intent prong, Plaintiff must prove that Dr. Schweikhart knew that those non-African-American students had engaged in similar conduct yet chose to treat them differently than she treated Plaintiff.

Against that backdrop, the Court concluded in its January 6, 2014 Opinion and Order that the following allegations stated a claim for race discrimination against Dr. Schweikhart:

- Dr. Schweikhart levied charges of plagiarism against only Plaintiff even though white students in her class utilized the same citation format that formed the basis of the plagiarism accusation (Am. Compl. ¶ 21);

- During her career, Dr. Schweikhart had referred three students for academic misconduct charges, all of whom were African-American, despite the fact that she had taught more than ten times as many white students as African-American students (id. ¶¶ 25-29)[.]

(ECF No. 40, at PAGEID # 212–13.)  The Court noted:  "It remains to be seen whether Plaintiff can back up these allegations with evidence sufficient to overcome summary judgment, much less prove them at trial.  But she has alleged enough to overcome dismissal under Rule 12(b)(6)." (*Id*. at PAGEID # 213.)

The evidence in this case does not support the first allegation.  It is undisputed that Plaintiff's "citation format" constitutes plagiarism within the meaning of OSU's Code of Student Conduct.  Plaintiff offers no admissible evidence that non-African-American students committed plagiarism at any time, let alone that Dr. Schweikhart knew those students had committed plagiarism.  Plaintiff therefore cannot prove that Dr. Schweikhart chose to refer only Plaintiff to the COAM even though white students in her class had engaged in similar conduct.

Plaintiff is left with only her second allegation: that Dr. Schweikhart previously had referred two other African-American students, and no white students, for academic misconduct charges.  Plaintiff argues that, although non-African-American students are just as likely to commit plagiarism as African-American students (and, presumably, in a way that would alert Dr. Schweikhart to the plagiarism), Dr. Schweikhart previously chose to only report the African-American students.  That fact (according to Plaintiff) supports the inference that Dr. Schweikhart

previously singled out African-American students for discipline, which in turn supports the inference that Dr. Schweikhart impermissibly singled out Plaintiff for discipline in this case.

Because this evidence requires inferences, it is not direct evidence of discrimination.  *See, e.g., Chandler v. Specialty Tires of Am. (Tenn.), Inc*., 134 F. App'x 921, 927 (6th Cir. 2005). Plaintiff therefore offers her statistics as indirect evidence that Dr. Schweikhart discriminated against her on the basis of race.

The parties agree that the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973), applies to evaluate this indirect evidence. Although the parties do not cite any caselaw in which a court applied the *McDonnell Douglas* burden-shifting framework in a § 1983 Equal Protection claim, the Court will assume *arguendo* that the framework applies to claims such as Plaintiff's.  *Cf. Bell v. Ohio State Univ*., 351 F.3d 240, 253 (6th Cir. 2003) (applying *McDonnell Douglas* in the university context to a discrimination claim under 42 U.S.C. § 1981(a)).

Under *McDonnell Douglas*, Plaintiff first must establish a prima facie case of discrimination.  *See, e.g., Sjostrand v. Ohio State Univ*., 750 F.3d 596, 599 (6th Cir. 2014) (citing *McDonnell Douglas*, 411 U.S. at 802).  Such a showing typically requires evidence that:

> (1) [Plaintiff] is a member of a protected class, (2) she suffered an adverse action at the hands of the defendants in her pursuit of her education; (3) she was qualified to continue in her pursuit of her education; and (4) she was treated differently from similarly situated students who are not members of the protected class.

*Bell*, 351 F.3d at 253.

If Plaintiff can establish her prima facie case, then Dr. Schweikhart must offer a legitimate, nondiscriminatory reason for referring Plaintiff (and not referring non-African-American students) to the COAM for plagiarism.  *See Sjostrand*, 750 F.3d at 599.  The burden

then shifts back to Plaintiff to present evidence that could support a finding that Dr. Schweikhart's explanation is merely a pretext for unlawful discrimination.  *See id.*

Plaintiff spends most of her brief arguing that her statistics are sufficient to make a prima facie case without resorting to the four factors cited above.  Regardless of whether the Court accepts that argument, however, it is of no consequence to the outcome of this case.  The Court therefore will assume without deciding that Plaintiff's statistics are sufficient to establish her prima facie case.

Dr. Schweikhart can rebut that prima facie case by offering a legitimate, nondiscriminatory reason for referring Plaintiff (and only Plaintiff) to the COAM.  In her deposition, Dr. Schweikhart testified that she read Plaintiff's paper and thought it did not sound like a student's paper that she was accustomed to grading.  *See* ECF No. 71, at PAGEID # 901. Certain phrases stood out as unusual.  *See id.*  Dr. Schweikhart therefore typed some of those phrases into Google, which revealed articles that very closely matched Plaintiff's work.  *See id.* Because Plaintiff had not used quotes or cited some of those materials, Dr. Schweikhart suspected that Plaintiff had committed plagiarism, and referred the matter to the COAM.  *See id.*

Dr. Schweikhart also testified that she reexamined the other, non-African-American students' papers in a similar manner.  *See id.* at PAGEID # 903.  Dr. Schweikhart typed some of the phrases from those papers into Google but did not find anything concerning.  *See id.* at PAGEID # 903.  Dr. Schweikhart therefore did not refer the non-African-American students to the COAM for discipline.

Dr. Schweikhart also testified as to why she previously referred two African-American students to the COAM.  In both of those cases, which occurred in the early to mid-1990s, Dr. Schweikhart had reason to believe that the students had engaged in misconduct (one for cheating

on a test and one for committing plagiarism), so she reported them to the COAM.  *See id.* at

PAGEID # 919.  The Court finds this testimony sufficient to satisfy Dr. Schweikhart's burden of

production and shift the inquiry back to Plaintiff.

      Plaintiff unpersuasively suggests that Dr. Schweikhart's proffered reasoning is flawed,

stating, "this nondiscriminatory rationale is simply no answer to Plaintiff's statistical proof."

(ECF No. 92, at PAGEID # 3545).  In making that argument, however, Plaintiff misunderstands

the use of statistics in a discrimination claim.  Even if statistics can, as Plaintiff argues, support

an inference of bias sufficient to establish a prima facie case, the prima facie case creates only a

rebuttable presumption of discrimination.  *See, e.g., St. Mary's Honor Ctr. v. Hicks*, 509 U.S.

502, 506 (1993).  The Court must still consider the other *McDonnell Douglas* prongs to

determine whether Dr. Schweikhart can rebut the presumption that the statistics create.  *See id.;*

*see also Barnes v. GenCORP Inc*., 896 F.2d 1457, 1466 (6th Cir. 1990) (holding that statistical

evidence could create an inference that a defendant discriminated against individual members of

the class, but going on to analyze the remaining *McDonnell Douglas* burden-shifting prongs).

Indeed, Dr. Schweikhart's proffered explanation in this case does exactly what the burden-

shifting framework contemplates:  it "undercut[s] the importance of [Plaintiff's] statistical

proof."  *Id*.  As such, "unless [Plaintiff] can show that [Dr. Schweikhart's] explanations are

inherently suspect or can present other direct or circumstantial evidence suggesting that the

proffered reasons are not true, then [Dr. Schweikhart is] entitled to summary judgment."  *Id*.

      Plaintiff does not attempt to make such a showing in this case.  As stated above, Plaintiff

does not dispute Dr. Schweikhart's observations about her work.  She therefore does not dispute

Dr. Schweikhart's proffered reason for referring her to the COAM.

As for Dr. Schweikhart's proffered reason for not referring non-African-American students to the COAM, Plaintiff offers only her own testimony about what other students allegedly told her.  *See* ECF No. 92, at PAGEID # 3542.  Such statements, offered for the truth of the matter asserted, are inadmissible hearsay that the Court is precluded from considering.  *See Wiley*, 20 F.3d at 226.  Plaintiff therefore offers no evidence suggesting that Dr. Schweikhart's proffered reasons are untrue.

Instead, Plaintiff again points to her statistics, offering the one-sentence argument that those statistics could prompt a jury to "readily conclude that this nondiscriminatory rationale offered by Dr. Schweikhart is merely pretextual."  (ECF No. 92, at PAGEID # 3545.)  Plaintiff does not explain or articulate that argument any further.  Plaintiff therefore does not explain why or how her statistics rebut Dr. Schweikhart's testimony that bias did not play a role in the particular decision to refer Plaintiff to the COAM.  Without more, the Court cannot conclude that there exists sufficient evidence from which a reasonable jury could find that Dr. Schweikhart's reasons for reporting Plaintiff to the COAM are a pretext for unlawful discrimination.

Having found that Plaintiff cannot satisfy the third *McDonnell Douglas* prong, the Court concludes that summary judgment in Dr. Schweikhart's favor is warranted.  The Court need not consider Dr. Schweikhart's additional argument that she is entitled to qualified immunity.

### C.  Deliberate Indifference Claim Against OSU

Plaintiff's next claim for relief is a "deliberate indifference" claim under Title VI of the Civil Rights Act of 1964 against OSU.  In this claim, Plaintiff asserts that OSU acted with deliberate indifference to Plaintiff's right to be free from race discrimination by investigating her allegations against Dr. Schweikhart but failing to take any action as a result of that investigation. The Court agrees with Defendants that this claim is without merit.

As Defendants note, the Sixth Circuit has not opined whether Title VI deliberate indifference claims survive *Alexander v. Sandoval*, 532 U.S. 275, 121 (2001), in which the Supreme Court held that Title VI only prohibits intentional discrimination.  Defendants raised this argument in their motion; however, Plaintiff did not respond.  Given that fact and the lack of authority Plaintiff cites on this issue, it does not appear that Plaintiff is seriously pursuing this claim.  Nevertheless, the Court will consider the parties' arguments.

Assuming *arguendo* that Title VI deliberate indifference claims survived *Sandoval*, Plaintiff does not come close to producing evidence sufficient to support a finding that OSU acted with deliberate indifference in this case.  Deliberate indifference is a "stringent standard of fault . . . for which even heightened negligence will not suffice."  *Plinton v. Cnty. of Summit*, 540 F.3d 459, 465 (6th Cir. 2008) (quoting *Bd. of Cnty. Commr's of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997) (internal quotations omitted).  "[A] plaintiff may demonstrate defendant's deliberate indifference to discrimination 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.' "  *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000) (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999)).

Here, Plaintiff faults OSU for finding insufficient evidence to support Plaintiff's allegations against Dr. Schweikhart.  The Court, however, similarly found insufficient evidence of discrimination.  The Court therefore cannot conclude that OSU's findings were clearly unreasonable such that OSU was deliberately indifferent to Plaintiff's rights.

Moreover, the fact that OSU investigated Plaintiff's allegations in the first place suggests that its conduct was not clearly unreasonable.  *See, e.g., DT v. Somers Cent. Sch. Dist.*, 588 F. Supp. 2d 485, 491 (S.D.N.Y. 2008) (granting summary judgment to the defendant school district

on a deliberate indifference claim when the school district "engaged in some forms of investigation . . . even though plaintiffs may have been dissatisfied with the outcome").  Plaintiff identifies several errors in the investigative report, such as the fact that she had taken one prior class with Dr. Schweikhart when the report stated that she had taken three, but these errors do not elevate OSU's conduct to deliberate indifference.  OSU therefore is entitled to summary judgment on Plaintiff's Title VI claim.

### D.  § 1983 Claim Against Dr. Salimbene

Plaintiff's third and final claim for relief is a § 1983 claim for First Amendment retaliation.  The basis of this claim is that Dr. Salimbene heard Plaintiff accuse Dr. Schweikart of discrimination at her first hearing before the COAM.  Plaintiff asserts that Drs. Salimbene and Schweikhart are friends and that, when Dr. Salimbene received information approximately one year later that Plaintiff had violated the terms of her suspension, Dr. Salimbene referred those allegations to the OSC in retaliation for Plaintiff's accusation against Dr. Schweikhart.  Plaintiff then asserts that Dr. Salimbene attended the OSC hearing, gave an opening and closing statement, and asked questions of witnesses in an effort to further retaliate against Plaintiff.

1.     *Elements of a First Amendment retaliation claim*

To prove her claim, Plaintiff must prove the following elements:

(1) [she] engaged in constitutionally protected conduct; (2) an adverse action was taken against [her] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by [her] protected conduct.

*Wurzelbacher v. Jones-Kelly*, 675 F.3d 580, 583 (6th Cir. 2012).  The parties agree, for purposes of summary judgment, that Plaintiff's accusations against Dr. Schweikhart satisfy the first prong of this test.

Regarding the second prong of this test, the Sixth Circuit has stated the following:

> The term adverse action arose in the employment context and has traditionally referred to actions such as discharge, demotions, refusal to [hire], nonrenewal of contracts, and failure to promote. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010) (quoting *Thaddeus–X* [*v. Blatter*,, 175 F.3d 378, 396 (6th Cir. 1999]). In the First Amendment context, however, we have held that any action that would deter a person of ordinary firmness from exercising protected conduct will [constitute a sufficient adverse action], which may include harassment or publicizing facts damaging to a person's reputation. *Id*. Whether an alleged adverse action is sufficient to deter a person of ordinary firmness is generally a question of fact. *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002). Nevertheless, when a plaintiff's alleged adverse action is inconsequential, resulting in nothing more than a *de minimis* injury, the claim is properly dismissed as a matter of law. *Id*. at 603, 606. Indeed, it trivialize[s] the First Amendment to allow plaintiffs to bring . . . claims for any adverse action[,] no matter how minor. *Id*. at 603 (internal quotation marks and citation omitted) (emphasis in original).

*Wurzelbacher*, 675 F.3d at 583 (internal quotations omitted).  The adverse action, therefore, must cause the plaintiff to suffer more than a *de minimis* injury.

Dr. Salimbene argues that her attendance at and participation in the OSC panel hearing did not cause a legally cognizable injury to Plaintiff.  The Court agrees.  Plaintiff attempts to tie Dr. Salimbene's conduct at the hearing to the suspension, but there is no evidence of a causal relationship between the two.  The neutral panel had an obligation to hear and evaluate the evidence at the hearing that formed the basis of the OSC's charges against Plaintiff.  It did so, decided that Plaintiff was guilty of one of the two charges against her, and decided to impose a two-semester suspension as a sanction.  There is no evidence that Dr. Salimbene's attendance at the hearing, opening statement, closing statement, or questions of the witnesses caused the panel to make that decision.  That is especially true given that the OSC panel found in Plaintiff's favor on one of the two charges.[4]

---

[4] Plaintiff argues that Dr. Salimbene's conduct was unusual for panel hearings and that deviations from an employer's standard practice can suggest discrimination, but this argument is without merit.  The case law Plaintiff cites is taken out of context and does not refute the Court's conclusion that Dr. Salimbene's attendance at and participation in the hearing did not cause Plaintiff's suspension.

Plaintiff therefore is left with Dr. Salimbene's initial referral of the alleged misconduct to the OSC.  Dr. Salimbene concedes that this referral constitutes an adverse action; however, it is important to define the injury that this conduct caused.  Because the OSC independently made the decision to charge and sanction Plaintiff, Dr. Salimbene's referral did not cause those injuries.  Dr. Salimbene's referral only *caused* the OSC's initial investigation.[5]  Once it conducted that investigation, the OSC could have decided not to charge Plaintiff and no further injury would have resulted.  The investigation, therefore, is the focus of the Court's analysis.

It is entirely unclear whether the fact that Plaintiff had an entity investigate her—independent from the charges and suspension that resulted—is more than a *de minimis* injury.  But the Court need not address that issue.  Because Dr. Salimbene concedes that her referral constitutes an adverse action, the Court will assume without deciding that Plaintiff meets the second prong of the First Amendment retaliation test.

At this point, the scope of Plaintiff's claim is limited to whether Dr. Salimbene violated Plaintiff's right to be free from a retaliatory investigation.  The question then becomes one of qualified immunity.  Even if Plaintiff can prove that Dr. Salimbene's referral was motivated by Plaintiff's protected speech, Dr. Salimbene will not be liable for Plaintiff's injuries if she is qualifiedly immune from suit.

### 2.     *Qualified Immunity*

As explained in the Court's January 6, 2014 Opinion and Order, the doctrine of qualified immunity can shield from civil liability governmental officials who are performing official duties.  *Sinick v. Summit*, 76 F. App'x 675, 679 (6th Cir. 2003).  Those officials cannot be liable

---

[5] The Court notes that, in its January 6, 2014 Opinion and Order, the Court found Plaintiff's allegation that Dr. Salimbene *charged* Plaintiff with violations of the University Student Conduct Policy sufficient to survive Dr. Salimbene's motion to dismiss.  (ECF No. 40, at PAGEID # 202).  The evidence does not support that allegation.

for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Courts use a two-step analysis to address a government official's qualified immunity defense. The Court first must decide "whether, considering the allegations in a light most favorable to the injured party, a constitutional right has been violated." *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 786 (6th Cir. 2012) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Court then must determine "whether that right was clearly established" at the time of the incident in question. *Id.* The Court need not consider these steps in order; it may consider either step first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The relevant inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable official that his or her conduct was unlawful in the situation he or she confronted. *Saucier*, 533 U.S. at 202. "Officials can still be on notice that their conduct violated established law even in novel factual circumstances;" however, the determinative issue is whether the official had "fair warning that his [or her] conduct deprived [the plaintiff] of a constitutional right." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

"The unlawfulness of the school administrator's action 'can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs.'" *Yoder v. Univ. of Louisville*, 526 F. App'x 537, 545 (6th Cir. 2013) (quoting *Feathers v. Aey,* 319 F.3d 843, 848 (6th Cir. 2003)). "When determining whether a constitutional right is clearly established, we look first to decisions of the Supreme Court, then to our own decisions and those of other courts within the circuit, and then to decisions of other

Courts of Appeal." *Id.* (quoting *Andrews v. Hickman Cnty., Tenn.*, 700 F.3d 845, 853 (6th Cir. 2012)).

Because Plaintiff bears the burden of demonstrating that the right to be free from a retaliatory referral to a neutral investigative body was clearly established at the time Dr. Salimbene referred her to the OSC, *Andrews*, 700 F.3d at 853, the Court begins its analysis with the sources Plaintiff cites. None of those sources define the scope of such a right. Instead, the case on which Plaintiff relies deals with a public official who published embarrassing information about an individual in retaliation for her protected speech. *See Bloch v. Ribar*, 156 F.3d 673, 683 (6th Cir. 1998). That the right to be free from retaliatory publication of embarrassing facts is clearly established does not mean that the right to be free from a retaliatory referral and/or investigation is clearly established.

In fact, in a loosely analogous case from the Eleventh Circuit, the Court of Appeals held that the right to be free from retaliatory investigation was not clearly established. *See Rehberg v. Paulk*, 611 F.3d 828, 850–51 (11th Cir. 2010). That rationale makes sense: absent any injury from the investigation itself, it is entirely unclear whether a referral to a neutral investigative body could violate a constitutional right. The Court therefore cannot conclude that Dr. Salimbene had fair warning that a retaliatory referral to the OSC violated Plaintiff's First Amendment rights.

For those reasons, the Court concludes that Dr. Salimbene is immune from liability on Plaintiff's First Amendment retaliation claim. Dr. Salimbene is entitled to summary judgment.

### III.     CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion for summary judgment. The Clerk is **DIRECTED** to enter judgment accordingly and to terminate this case

from the docket records of the United States District Court for the Southern District of Ohio,

Eastern Division.

**IT IS SO ORDERED.**

/s/ Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE